## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JIMMY IRVIN WRIGHT, | CASE NO. 1:14-cv-02350-SHR-GBC |
| Plaintiff, | (JUDGE RAMBO) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | Docs. 1, 7, 8, 12, 13 |

## REPORT AND RECOMMENDATION

### I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Jimmy Irvin Wright ("Plaintiff") for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.* (the "Regulations").

An older claimant is presumed to be less able to transition to new work than a younger claimant. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 2, §200.00(a) *et seq.*. Consequently, claimants who are capable of performing unskilled light work generally may not be considered disabled at age fifty, while claimants who are

capable of performing only unskilled sedentary work generally will be considered disabled at age fifty. *Id.* A claimant who is capable of performing only unskilled light work will be generally be considered disabled at age fifty-five. *Id.* Here, Plaintiff was over the age of fifty throughout the relevant period. *Infra.* Every medical opinion authored during the relevant period indicated that Plaintiff could perform only sedentary work. *Infra.*

An administrative law judge ("ALJ") found that Plaintiff could perform light work throughout the relevant period. *Infra.* Consequently, the ALJ concluded that he was disabled under the Act as of December 27, 2011, when he turned fifty-five years old. *Infra.* As an initial matter, this was an error, because an ALJ must not apply age categories mechanically, and must consider a claimant's capacity during a "borderline age" period. *See* 20 CFR § 404.1563(b).

Moreover, the ALJ erred in finding that Plaintiff could perform light work. After the ALJ initially found that Plaintiff was not disabled from November 8, 2008 to December 26, 2011, Plaintiff appealed to the Appeals Council. The Appeals Council granted Plaintiff's appeal. The Appeals Council noted that two medical opinions in the record indicated that Plaintiff could perform sedentary work, at most, which would render him entitled to benefits throughout the relevant period. The Appeals Council ordered the ALJ to obtain medical expert testimony to rebut these two medical opinions and support the ALJ's determination that

Plaintiff could perform light work. The Appeals Council prohibited the ALJ from relying on a state agency opinion from November of 2008 to reject these opinions. However, at the supplemental hearing, the new medical expert also testified that Plaintiff could only perform sedentary work.

The ALJ disagreed with the Appeals Council's assessment of the applicable law, and refused to follow the Appeals Council's order. However, the Appeals Council correctly applied the relevant law. An ALJ may not supplant the opinion of a competent professional with lay interpretation of medical evidence as long as the opinion is supported by medically acceptable findings. As the Social Security Administration has explained, an opinion does not need to be fully supported, because that would be an impracticably high standard. The ALJ is bound not only by the Regulations, but also Third Circuit precedent. Third Circuit precedent prohibits an ALJ from reinterpreting medical evidence to reject a treating source medical opinion. *See Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988; *Doak v. Heckler*, 790 F.2d 26, 29-30 (3d Cir. 1986); *Ferguson v. Schweiker*, 765 F.2d 31, 37, 36-37 (3d Cir. 1985); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983); *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir.1983); *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 494 (3d Cir. 1980); *Rossi v. Califano*, 602 F.2d 55, 58-59, (3d Cir. 1979); *Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir. 1979); *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978). These cases hold that, even under the

deferential substantial evidence standard of review, no reasonable person would find lay reinterpretation of medical evidence to be adequate to find a claimant was not disabled. *Id.* Subsequent regulatory amendments retain this common law. *See* 20 C.F.R. §404.1527(c). Consequently, the Court recommends granting Plaintiff's appeal, vacating the decision of the Commissioner, and remanding for further proceedings.

## II.    Procedural Background

On February 16, 2011, Plaintiff applied for DIB under the Act. (Tr. 240-53). On May 9, 2011, the Bureau of Disability Determination denied Plaintiff's application (Tr. 143-57), and Plaintiff requested a hearing. (Tr. 212-13). On June 6, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 99-124).  On August 27, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits prior to December 27, 2011. (Tr. 158-82). Plaintiff requested review by the Appeals Council, which the Appeals Council granted on October 18, 2013, vacating the ALJ's denial of benefits prior to December 27, 2011 and remanding for further proceedings. (Tr. 184-88). On March 13, 2014, the ALJ held a hearing at which a medical expert testified. (Tr. 125-40). On May 12, 2014, the ALJ issued a decision denying all benefits for Plaintiff, including the benefits he was receiving for disability after December 27, 2011. (Tr. 35-66). On September 24, 2014, the

ALJ issued an amended decision reinstating benefits for the period after December 27, 2011 and denying benefits for the period before December 27, 2011. (Tr. 7-32). Plaintiff requested review with the Appeals Council (Tr. 34), which the Appeals Council denied on November 5, 2014, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On December 11, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 5, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On March 30, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 11). On May 1, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 12). Plaintiff did not file a brief in reply. On June 29, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.   Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence,

but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also*

*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V.     Relevant Facts in the Record

Plaintiff was born on December 27, 1956 and was classified by the Regulations as a person closely approaching advanced age through December 27, 2011. (Tr. 30); 20 C.F.R. § 404.1563. He earned income for thirty-five straight years, beginning when he was about fourteen years old. (Tr. 264). In his last ten full years of employment, 1996 to 2006, he earned between $62,700.00 and $136,800.00 each year as a project manager for a bank. (Tr. 264). He underwent surgery in 1999 to remove skin cancer from his left arm and in 1998, 1999, 2002, and May of 2006 to repair hernias. (Tr. 646-47).

Plaintiff was injured in a car accident in June of 2006, and began complaining of upper extremity and neck symptoms. (Tr. 361). He worked through February of 2007. (Tr. 238). He was diagnosed with a herniated disc in his cervical spine and underwent surgical fusion in March of 2007. (Tr. 361). His surgeon restricted him from working through August of 2007. (Tr. 491-95, 933, 941, 944).

In August of 2007, Plaintiff began experiencing abdominal pain from another hernia, and underwent surgical repair, delaying his rehabilitation from spine surgery. (Tr. 444-59, 532). He underwent physical therapy and was discharged in December of 2007, but his physical therapists, primary care provider Dr. Garrison, and physiatrist Dr. Vrablik observed continued upper extremity and abdominal weakness. (Tr. 471-72, 555, 952-79). Dr. Garrison, Dr. Vrablik, and an

independent medical examiner from his employer instructed him to remain off work so he could continue receiving treatment. (Tr. 471-72, 533, 535, 946).

Dr. Garrison continued to restrict Plaintiff from working through 2008. (Tr. 471-72, 533, 535, 539, 565, 946). During 2008, his spine surgeon observed swelling, an EMG "was suggestive of a C5-C6 radiculopathy," and "prior cervical spine studies suggested chronic odontoid deformity." (Tr. 361, 504-05, 517). Dr. Garrison referred Plaintiff to a neurologist, Dr. Yevgeniy Khesin, M.D., who observed no abnormalities. (Tr. 512, 588). Plaintiff underwent an injection and another round of physical therapy, and physical therapists observed abnormal posture, range of motion, muscle tension, muscle spasm, spinal dysfunction, and positive Apley's Compression Test, Adson's Maneuver, and Soto Hall testing. (Tr. 572-80, 982-88, 991). Dr. Vrablik observed pain limited strength, decreased range of motion, abnormal posture, an elevated right shoulder, and swelling in the legs. (Tr. 630-32). Dr. Garrison observed depression and noted the physical therapists report of "very limited/frozen" cervical spine range of motion. (Tr. 539).

In August of 2008, he had a recurrence of abdominal symptoms (Tr. 600, 603, 631). He underwent surgical repair of a "recurrent ventral abdominal wall incisional hernia." (Tr. 600, 603). Upon evaluation for his surgery in August of 2008, he reported "currently hav[ing] problems with his neck and right shoulder stemming from his accident and subsequent to his surgical discectomy and fusion

in March 2007" with weakness and pain that "significantly limits his function on a daily basis." (Tr. 600). On examination, Plaintiff exhibited weakness and discomfort in his neck extending to the right shoulder, along with "deformity of the right posterior shoulder and scapula with some muscle atrophy." (Tr. 601).

Plaintiff began reporting side effects, particularly severe fatigue, from his medications, which included Prozac, Valium, an escalating dose of oxycodone, and Amarix. (Tr. 470, 539, 634-35). He also reported increasingly limited activities. (Tr. 471-72, 533, 600, 631-32).

Plaintiff was awarded long-term disability benefits from his employer's carrier, Hartford Life Insurance Company, and received $68,062.53 in 2008 and $49,306.97 in 2009. (Tr. 259, 261, 264). Plaintiff initially filed for benefits under the Act in May of 2008. (Tr. 141). The state agency denied the application on November 7, 2008. (Tr. 141). The record does not contain a detailed explanation of this denial. (Tr. 141). However, the record contains an opinion from state agency physician Dr. Leo Potera, M.D., who reviewed Plaintiff's file through November 5, 2008 and authored a medical opinion. (Tr. 361). Dr. Potera opined that Plaintiff could perform a range of light work. (Tr. 361).

Dr. Potera wrote that Plaintiff, at that time, had not "submit[ted] a description of his daily activities" but "daily activities are mentioned throughout" the evidence" and were "not significantly limited in relationship to the alleged

symptoms." (Tr. 361). Dr. Potera does not cite to any record evidence where "daily activities are mentioned." (Tr. 361). Dr. Potera does not acknowledge Plaintiff's report of limited activities, specifically a November 2007 report that he had "severe pain and fullness throughout the back, which is limiting mobility and activities of daily living" and "difficulty functioning with the level of pain" (Tr. 471-72); a December 2007 report that his pain interfered with activities and work 70%-80% and that his medications made him "very tired" (Tr. 470); an April 2008 report that pain interfered with activities "80%-100%" and that he could not "sit or use the arm for any prolonged period of time" (Tr. 632); an August 2008 report that pain interfered with "80%-100" of his activities (Tr. 631); or an August 2008 report that weakness and pain "significantly limits his function on a daily basis." (Tr. 600).

Dr. Potera opined that Plaintiff's surgery "resulted in significant improvement of his symptoms." (Tr. 356-61). Dr. Potera noted Dr. Khesin's normal examinations and Dr. Vrablik's April 2008 observation of tenderness and "mild decrease[d] range of motion." (Tr. 361). Dr. Potera did not acknowledge other medical findings, such as Dr. Vrablik's November 2007 observation of "abdominal weakness" (Tr. 471-72); Dr. Garrison's December 2007 observation of "chronic…weakness" and "very limited…strength with the upper extremities and stomach muscles" (Tr. 533); Dr. Vrablik's December 2007 observation of

abnormal posture and "weakness of the interscapular region" (Tr. 470); Dr. Dwyer's January 2008 observation of interscapular swelling (Tr. 661); Dr. Garrison's February 2008 observation of "very limited/frozen" cervical spine range of motion (Tr. 539); physical therapists' consistent observations of spinal dysfunction and muscle spasm from February of 2008 to April of 2008 (Tr. 573-80); physical therapists' observations of "poor" posture, with cervical and thoracic muscle tension, decreased range of motion in the cervical spine, and positive Apley's Compression Test, Adson's Maneuver, and Soto Hall testing in March of 2008 (Tr. 575); Dr. Vrablik's observation of trigger point and medication side effects in March of 2008 (Tr. 635); Dr. Vrablik's observation of abnormal posture and elevated shoulder in August of 2008 (Tr. 631); and hospital records from August of 2008 showing weakness and discomfort in his neck extending to the right shoulder, along with "deformity of the right posterior shoulder and scapula with some muscle atrophy." (Tr. 601). Although Dr. Dwyer, Dr. Vrablik, Dr. Garrison, and the independent medical examiner had opined during the relevant that Plaintiff was unable to work, Dr. Potera indicated that there were no "treating or examining source statement[s] regarding the claimant's physical capacities in [the] file." (Tr. 360, 471-72, 491-95, 533, 535).

Plaintiff reported to providers that, in December of 2008, he appealed his initial denial of benefits. (Tr. 744). By November of 2010, he had learned that the state agency had "no record of his appeal." (Tr. 740).

On January 13, 2009, Plaintiff underwent another surgical repair of an abdominal hernia. (Tr. 617, 876-78, 1002-1005).

During 2009, Dr. Vrablik observed Plaintiff's legs were swelling, he was slow to transition from sit to stand, his posture was "very poor," and he exhibited decreased cervical range of motion, strength, and sensation. (Tr. 623, 628, 665-66, 668). Dr. Vrablik increased Plaintiff's Oxycontin through 2009, continued oxycodone and morphine, and added an escalating dose of Lyrica. (Tr. 622, 624, 626, 668). Dr. Dwyer noted that MRI of the cervical spine showed "mild degenerative disc disease" and a CT scan showed "mild fragmentation at the tip of the odontoid." (Tr. 615-16, 1008). Dr. Dwyer diagnosed Plaintiff with cervical and lumbar spondylosis and recommended a course of physical therapy and epidural injections. (Tr. 615). He indicated that there was "no major surgical pathology" in the spine. (Tr. 615). Plaintiff was evaluated by physical therapists, who observed his posture and appearance were "poor," muscle tension in his cervical and thoracic spine with limited range of motion in his cervical spine, and positive Adson's maneuver and Soto Hall testing. (Tr. 679). After his evaluation, he temporarily lost his insurance. (Tr. 665).

In 2009, Dr. Garrison noted that Dr. Vrablik had concluded that Plaintiff's arm pain was from the "cancer/sarcoma" that was removed in 1999, abdominal pain was from hernias and surgical repair, and "the neck and scapular pain is from the fusion of the cervical vertebrae and the chronic nerve impingement/injury," so "no further treatment is available other than meds at this time." (Tr. 843). Dr. Garrison noted Plaintiff's chiropractor refused to perform any more treatments because it was "too risky." (Tr. 843). Dr. Garrison noted that Plaintiff's abdominal surgeon opined that Plaintiff's abdominal pain was "from the mesh being too tight and it is not worth the surgical risk to remove the mesh, this is the cause of the [abdominal] pain, so [he] will have chronic pain." (Tr. 851). Dr. Garrison opined that Plaintiff was "clearly addicted to the pain meds, but [he does] need them and must be careful to avoid missing doses because of risks of withdrawal." (Tr. 852).

On October 29, 2009, Dr. Richard Boorse, M.D., conducted an independent medical examination "to evaluate [Plaintiff's] medical condition related to multiple abdominal wall hernias." (Tr. 646).  Plaintiff reported "bilateral groin pain" and "chronic constipation." (Tr. 647). Dr. Boorse noted that Plaintiff was "on multiple medications including Oxycodone, Prozac, OxyContin, Ambien, Mobic, Amarix and Valium, all of which can have constipation as a side effect." (Tr. 647). On examination, he had "an upper midline diastasis rectus" and two hernias, one "at the level of his umbilicus" and a "small, slightly tender right inguinal hernia which

is easily reducible." (Tr. 647).  Dr. Boorse opined that Plaintiff had "an extremely weak abdominal wall, and he is hernia prone." (Tr. 648). He indicated that Plaintiff's groin pain could be caused by the inguinal hernia or by "spiral tacks" that had been used to secure mesh from his last hernia repair. (Tr. 648). Dr. Boorse opined that Plaintiff would eventually need to undergo surgical repair for his two remaining hernias. (Tr. 648).

On January 13, 2010, Dr. Vrablik assessed Plaintiff to have "chronic intractable pain affecting the cervical spine, shoulder and left arm where he had a skin cancer surgery." (Tr. 664). On April 7, 2010, Plaintiff reported that his pain medications provided some relief, but it was "incomplete," and that his "main complaint with the medications is lethargy." (Tr. 662). Dr. Vrablik prescribed Provigil to "address…lethargy." (Tr. 662).

Through 2009, 2010, and 2011, Dr. Garrison continued to restrict Plaintiff from work, opining that he was "unable to work at all; unable hold anything above 5 pounds with right hand," "unable to perform any kind of work activity," "disabled," "clearly not capable of holding gainful employment for any duration of time…cannot use a computer…unable to sit for over 15mins at a time because of the abdomen pain and the scapular pain." (Tr. 651, 806, 817, 824, 844, 860).

Plaintiff continued to reported limited activity level due to pain and medications. (Tr. 617, 623, 625, 651, 678).  His daily function was "very limited"

and he was "unable to do any type of sustained work or activity for more than about an hour." (Tr. 667). Dr. Garrison and Dr. Vrablik treated medication side effects of constipation with Miralax and treated fatigue with an escalating dose of Provigil, followed by Ritalin when Plaintiff could no longer afford Provigil. (Tr. 622, 661). By July of 2009, Plaintiff's constipation had been relieved with the Miralax. (Tr. 668). However, Provigil wore off "about halfway through the day." (Tr. 651, 661). Plaintiff's nausea continued. (Tr. 651).

On July 7, 2010, Dr. Garrison noted that Plaintiff "appear[ed] ill" with abnormal neck motion, stiffness, muscle spasm, and pain, tenderness and muscle spasm in his thoracic spine, and abdominal tenderness. (Tr. 652-53).  Dr. Garrison increased Plaintiff's provigil to 200 mg twice a day to combat the "severe fatigue from the pain meds." (Tr. 653). He prescribed Fofran, "because of the nausea… from the chronic pain and from the meds." (Tr. 653).

On August 3, 2010, Plaintiff established psychiatric care with Dr. Ray Biersbach. (Tr. 734-56, 777). On examination, Dr. Biersbach observed that he was "oriented, serious" and reported being "unable to do any high-level thinking" with his medications. (Tr. 753).Plaintiff explained that he could not stay awake for eight hours due to Oxycontin and was "exhausted." (Tr. 748). He reported that was "worth more dead than alive," but Prozac, Abilify, and Valium "help." (Tr. 748). He reported significant financial problems and issues with his attorney. (Tr. 747).

Dr. Biersbach diagnosed him with a mental disorder, not otherwise specified, and assessed him to have a global assessment of functioning ("GAF") of 50. (Tr. 754).

Plaintiff saw Dr. Biersbach monthly. (Tr. 734-56, 777).   On August 24, 2010, he reported that he "could not remember a lot of his technical computer work that he did successfully for [twenty] years." (Tr. 746). On October 21, 2010, Dr. Biersbach observed that Plaintiff "looked medicated." (Tr. 742).   His "words [were] slow, mildly slurred." (Tr. 742). Plaintiff indicated that, with morphine, he "forgets things." (Tr. 742). Dr. Biersbach noted that Plaintiff was "raw emotionally from the pain." (Tr. 741). On December 15, 2010, Plaintiff reported to Dr. Biersbach that he had gone hunting, but his hands went numb and he was unable to "work his gun." (Tr. 739). On January 11, 2011, he reported having a "painful herniated disc" and reported that he could not stay awake, despite provigil and "lots of coffee." (Tr. 738). He indicated that he was in "more pain than [he had] ever been" but was about to lose his insurance. (Tr. 738). On March 8, 2011, Plaintiff described his typical day:

> He wakes up [at] 5 a.m. stiff as a board every day, takes provigil (like speed to keep awake). Provigil takes three hours to work. He gets up [at] 6 a.m. He then drinks 4-5 cups of coffee, then [a five hour] energy drink, [and] then [a second] provigil so he can see [Dr. Biersbach]. By 9:00 a.m. he has enough energy to get ready. Then [at] 10:00 am he takes morphine for pain so he can drive…40-45 minutes [to Dr. Biersbach's office] and back. To sleep he needs two Ambien…to sleep…He also needs an Oxycontin to sleep…His life is spent coping [with] pain. The hour or two he has [with] less pain is spent preparing for…disability [and] other paperwork.

Page **17** of **58**

(Tr. 735-36).

Between December of 2010 and March of 2011,[1] Plaintiff followed-up with Dr. Garrison. (Tr. 821-23). He exhibited muscle spasm and tenderness in his neck and spinal range of motion limited by pain. (Tr. 822). Plaintiff was scheduled for testing for hyperlipidemia. (Tr. 821). In another treatment record with Dr. Garrison on February 10, 2011, Dr. Garrison noted that Plaintiff's pain was "stable, but [he was] disabled." (Tr. 824). Dr. Garrison noted constipation and nausea "from the meds and the condition." (Tr. 824). On March 10, 2011, Plaintiff reported fatigue that was "severe from the illness and the meds" with energy that was "still very limited" despite treatment with Provigil. (Tr. 817). Dr. Garrison observed muscle spasm in his neck with stiffness and abnormal range of motion along with tenderness in his back and abdomen. (Tr. 818).

The same day, Dr. Garrison authored a medical opinion. (Tr. 733). Dr. Garrison indicated that Plaintiff exhibited interscapular swelling and decreased sensation in the right arm. (Tr. 729). He indicated that Plaintiff suffered from fatigue, anxiety, worry, pacing, and low ambition, and that he had prescribed Prozac, Abilify, and Valium with "some improvement in mood." (Tr. 730). He opined that Plaintiff could perform activities of daily living on a sustained basis

---

[1] The exhibit number obscures the date for this record. (Tr. 821-23). Plaintiff was described as a fifty-four year old man in this record. (Tr. 821-23). He turned fifty-four years old on December 27, 2010. (Tr. 30). This record occurs before March of 2011. (Tr. 816-20).

and get along with others, but was unable to sustain sufficient attention, with "trouble focusing to read directions to do simple tasks," explaining that "some things that should take 30 min[utes] now take all day." (Tr. 731). He opined that Plaintiff cannot be in the same position for more than thirty minutes, and was unable to lift and carry with his right arm. (Tr. 764).

On April 28, 2011, Plaintiff presented to state agency physician Dr. Barry Kurtzer, M.D., for a consultative examination. (Tr. 758). Dr. Kurtzer observed abdominal pain and tenderness, "marked tenderness" in the cervical spine, thoracic spine, and shoulders, abnormal posture, and pain on range of motion. (Tr. 759-60). No specific opinion from Dr. Kurtzer regarding Plaintiff's functional capacity appears in the record. Doc. 8. On May 3, 2011, Plaintiff reported to Dr. Biersbach that his appointment with Dr. Kurtzer "lasted 5 min[utes]" and Dr. Kurtzer "agreed [he] should be on [Social Security disability]." (*Tr. 765).

On March 9, 2011, June 8, 2011 and August 1, 2011, Plaintiff followed-up with Dr. Vrablik. (Tr. 789-90, 794-95). Dr. Vrablik noted that they "received a packet from Social Security, requesting a disability evaluation… form was filled out. He has limitations especially in lifting, carrying, pushing and pulling…Able to do minimal work at the house." (Tr. 789-90, 794-95). No evaluation from Dr. Vrablik appears in the record. Doc. 8.

On June 30, 2011, Dr. Biersbach authored a medical opinion. (Tr. 783). Dr. Biersbach opined that Plaintiff would miss more than four days of work per month and suffered marked limitation in activities of daily living, marked limitation in maintaining social functioning, and extreme limitation in maintaining concentration, persistence, and pace. (Tr. 782). He opined that Plaintiff had "no useful ability to function" in multiple aspects of unskilled and skilled work. (Tr. 779-81). He identified Plaintiff's symptoms as "anhedonia or pervasive loss of interest in almost all activities," "decreased energy," "blunt, flat, or inappropriate affect," "feelings of guilt or worthlessness," "difficulty thinking or concentrating," "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress," psychomotor retardation, "apprehensive expectation," a "loss of previously acquired functional abilities," "vigilance and scanning," "easy distractibility," "memory impairment," and "loss of intellectual ability of 15 IQ points or more." (Tr. 778). Dr. Biersbach explained that "pain and pain medication retarded his responses." (Tr. 777).   Dr. Biersbach wrote, "he reports and I observe that the pain and related medication disable him from attending to anything complex in our conversations." (Tr. 779). Dr. Biersbach noted that, during their sessions, "after about 20-30 minutes it is evident that he is exhausted." (Tr. 780).

Between July 27, 2011 and December 22, 2011,[2] Plaintiff followed-up with Dr. Garrison. (Tr. 804). Plaintiff's medications remained the same. (Tr. 805). Plaintiff reported fatigue "from the illness and the meds," was on "Provigil with some benefit, but still tired all the time." (Tr. 808). Plaintiff's depression was "getting worse, on multiple meds including Prozac and ability, not suicidal but very depressed with situation." (Tr. 808). Dr. Garrison increased Plaintiff's Prozac. (Tr. 810). Plaintiff exhibited muscle spasm in his back, back tenderness, stiffness, and abnormal spinal range of motion. (Tr. 806). Dr. Garrison noted that Plaintiff's "chronic conditions seem stable, but still chronic pain, unable to work in any capacity, total disability." (Tr. 806). He recommended acupuncture for Plaintiff's back pain. (Tr. 806).

On September 7, 2011, September 28, 2011, November 16, 2011, and December 21, 2011, Plaintiff followed-up with Dr. Vrablik. (Tr. 797-800). Plaintiff continued reporting abdominal and upper extremity pain, and had begun reporting severe lumbar back pain and "severe right leg radicular pain." *Id.* Dr. Vrablik continued his prescription for 30 mg of oxycodone every four hours. *Id.* Dr. Vrablik also treated his lower extremity and lumbar pain with steroids. *Id.*

On March 6, 2012, Plaintiff presented to the emergency department at Morristown Memorial Hospital complaining of lower back pain radiating to his

---

[2] The Exhibit Numbers added to these records obscure the specific dates. (Tr. 804-811).

right thigh. (Tr. 880). Plaintiff exhibited muscle spasm, tenderness, and positive straight leg raise. (Tr. 882). Lumbar spine MRI indicated "right-sided disc herniation at L5-S1 which may be accounting for some of the symptoms" with "some additional mild degenerative changes." (Tr. 871). Plaintiff improved and was discharged with instructions to follow-up with Dr. Dwyer. (Tr. 883). He underwent surgery on March 23, 2012.[3] (Tr. 108).

On June 6, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 99-124). He testified that he stayed with his children or with a friend. (Tr. 109). He testified that he did not shop unassisted. (Tr. 111). He testified that he walked up and down the stairs "the entire day." (Tr. 111). He testified that the only household chore he performed was "microwave cooking." (Tr. 109). He testified that he watches television and goes to church every Sunday. (Tr. 110). He testified that he gets along with his immediate family, but not people in general. (Tr. 111). He explained that he "feel[s] like [he has] a plague" because of his condition. (Tr. 111). He testified that he heaviest thing he had picked up in the last thirty days was a juice bottle. (Tr. 112). He testified that he could not reach overhead (Tr. 112). He testified that pain in his back and muscle spasm interrupt his sleep. (Tr. 113). He testified that, before the March 2012 surgery, he "could walk between 30 and 100

---

[3] Plaintiff continued receiving treatment thereafter, but the Court limits its discussion to the evidence pertinent to the relevant period, which ended in November of 2011. Doc. 8.

feet." (Tr. 114). He testified that he could stand for ten minutes before needing to sit and sit for twenty minutes before needing to stand. (Tr. 114). He testified that sitting, standing, and bending caused "tremendous muscle spasm" and the "only way [he] can sit down without pain is to sit on the bed with [his] feet propped up." (Tr. 116). He testified that it took him four and a half hours to drive eighty-seven miles to his attorney's office "because [he] had to stop about every 20 minutes and walk because of muscle spasms" and that he had to travel to hearing the day before because he "would have had to have gotten up at 2:00 o'clock in the morning to make it here on time." (Tr. 117). He testified that he "switch[es] between three pain killers-amlodipine, oxycodone, and Oxycontin" so that he does not "build up too much tolerance to just one type of medication. (Tr. 115). He testified that, in addition to the pain medication, he was taking zolpidem, Ritalin, Prozac, Ambien, Abilify, Ciprofloxacin, Amrix, Xalatan, fluoxetine, meloxican, and methocarbamol. (Tr. 115-16).  He testified that his medications caused side effects, affecting his ability to speak and slowing his thought processes. (Tr. 117-18).

On August 27, 2012, the ALJ issued a partially favorable decision, finding that Plaintiff was entitled to benefits after December 27, 2011, when he turned fifty-five years old, but not before. (Tr. 158-82). The ALJ found that, throughout the relevant period, Plaintiff was able to do light work. (Tr. 158-82). An ability to do only light work typically renders a claimant disabled at age fifty-five, but not

before. 20 C.F.R. § Pt. 404, Subpt. P, App. 2. The ALJ did not consider Plaintiff's

entitlement to benefits during the "borderline" period before he switched age

categories. *See* 20 CFR § 404.1563(b) ("We will not apply the age categories

mechanically in a borderline situation. If you are within a few days to a few

months of reaching an older age category, and using the older age category would

result in a determination or decision that you are disabled, we will consider

whether to use the older age category after evaluating the overall impact of all the

factors of your case.").

Plaintiff appealed his denial of benefits prior to December 27, 2011 to the

Appeals Council. (Tr. 237-38). On October 18, 2012, the Appeals Council granted

Plaintiff's appeal and remanded the case. (Tr. 184-88). The Appeals Council

ordered the ALJ to reassess her finding that Plaintiff could perform light work. (Tr.

185). The Appeals Council noted that the ALJ had relied on Dr. Potera's opinion,

but Dr. Potera's opinion "was based on a review of the evidence in the record at

the time of a prior application/determination and is dated prior to the date of the

current  period at issue," while "David Garrison, M.D., completed questionnaires

stating the claimant cannot be in the same position for over 30 minutes and he

cannot lift/carry with his right arm." (Tr. 186). The Order explained that:

> [T]here is no other opinion (during the current period at issue) from a
> treating, nontreating or nonexamining source to rebut said opinion(s).
> Given that the claimant has had additional surgeries since the State
> Agency consultant reviewed the file in connection with the prior

claim, a medical expert should be consulted regarding the nature and severity of the claimant's impairments.

(Tr. 186).

At a subsequent hearing, the ALJ consulted with a medical expert, Dr. John Menio, M.D. (Tr. 128). Dr. Menio reviewed the medical evidence and opined that Plaintiff could perform only sedentary work prior to December 27, 2011. (Tr. 131-39). Dr. Menio explained that "[a]n individual with back spasms and tenderness would not be able to be able to do a full range of activity." (Tr. 137-38). Dr. Menio identified "objective findings…on physical examination by Dr. Garrison," such as "muscle spasms along with associated complaints of back pain and muscle stiffness which is supported by the physical examination"  and "evidence of a restricted -- a range of motion." (Tr. 138). Dr. Menio  also identified "trigger points" and "right shoulder weakness." (Tr. 134). Dr. Menio noted Plaintiff's diagnosis of spondylosis and his "multiple medications." (Tr. 137). Dr. Menio explained that "in dealing with individuals who have neck surgeries, the greatest proportion of people…[do] not become successful." (Tr. 133-34). He noted that there may be "a significant amount of symptomatology related to… scar tissue" which does not appear on imaging. (Tr. 134). Dr. Menio explained that a "musculoskeletal type of pathology" is not typically "seen on any type of imaging study." (Tr. 139).

The ALJ rejected the Appeals Council's conclusion that Dr. Potera's opinion could not be relied on, writing that:

> The Appeals Council questioned the reliance on the November 5, 2008 opinion of the State agency medical consultant (Exhibit 2F). However, the undersigned notes that the period under review begins at November 8, 2008, a period in time 3 days prior to the what the current decision did and now covers. This opinion is relevant for evaluation of the period immediately around the time of the beginning of this period. As such, it was appropriately considered in evaluating the initiation of the current period.

(Tr. 12).

The ALJ also refused to comply with the Appeals Council order to obtain a medical opinion to rebut Dr. Garrison:

> The Appeals Council also stated that the undersigned gave little weight to Dr. Garrison's opinions and noted there were no other opinions during the current time period from a treating, non-treating or non-examining source to "rebut" Dr. Garrison's opinion and required that the undersigned obtain a medical expert to determine the nature and severity of the claimant's impairments (Exhibit 7 A). The undersigned has reviewed the relevant statute and regulations and has not been able to locate any relevant or applicable law or regulations that require that the adjudicator is to "rebut" opinions or for that matter obtain "opinions" to "rebut" an opinion. What the regulations do require is that the adjudicator evaluate and weigh those opinions.

(Tr. 12). Consequently, the ALJ again found that Plaintiff could perform light work prior to December 27, 2011, and was not disabled. (Tr. 7-32).

## VI.    Plaintiff Allegations of Error

### A.    Assignment of Weight to the Medical Opinions

### 1.    Dr. Potera's opinion does not provide substantial evidence to reject Dr. Menio's opinion and Dr. Garrison's opinion

Dr. Potera's opinion does not provide substantial evidence to reject Dr. Menio's opinion and Dr. Garrison's opinion. Dr. Menio and Dr. Garrison addressed the relevant period, from November of 2008 through 2011, while Dr. Potera authored his opinion prior to the relevant period. (Tr. 184-88). As the Appeals Council noted, Plaintiff underwent significant treatment subsequent to Dr. Potera's opinion. (Tr. 184-88).  Moreover, Dr. Potera mischaracterized the record prior to November 2008 with regard to the non-medical evidence, medical evidence, and opinion evidence. Dr. Potera wrote that Plaintiff, at that time, had not "submit[ted] a description of his daily activities" but "daily activities are mentioned throughout" the evidence" and were "not significantly limited in relationship to the alleged symptoms." (Tr. 361). Dr. Potera does not cite to any record evidence where "daily activities are mentioned." (Tr. 361). Dr. Potera does not acknowledge Plaintiff's report of limited activities, specifically a November 2007 report that he had "severe pain and fullness throughout the back, which is limiting mobility and activities of daily living" and "difficulty functioning with the level of pain" (Tr. 471-72); a December 2007 report that his pain interfered with activities and work 70%-80% and that his medications made him "very tired" (Tr.

470); an April 2008 report that pain interfered with activities "80%-100%" and that he could not "sit or use the arm for any prolonged period of time" (Tr. 632); an August 2008 report that pain interfered with "80%-100" of his activities (Tr. 631); or an August 2008 report that weakness and pain "significantly limits his function on a daily basis." (Tr. 600).

Dr. Potera opined that Plaintiff's March 2007 surgery "resulted in significant improvement of his symptoms." (Tr. 356-61).  Dr. Potera noted Dr. Khesin's normal examinations and Dr. Vrablik's April 2008 observation of tenderness and "mild decrease[d] range of motion." (Tr. 361). Dr. Potera did not acknowledge other medical findings, such as Dr. Vrablik's November 2007 observation of "abdominal weakness" (Tr. 471-72); Dr. Garrison's December 2007 observation of "chronic…weakness" and "very limited…strength with the upper extremities and stomach muscles" (Tr. 533); Dr. Vrablik's December 2007 observation of abnormal posture and "weakness of the interscapular region" (Tr. 470); Dr. Dwyer's January 2008 observation of interscapular swelling (Tr. 61i); Dr. Garrison's February 2008 observation of "very limited/frozen" cervical spine range of motion (Tr. 539); physical therapists' consistent observations of spinal dysfunction and muscle spasm from February of 2008 to April of 2008 (Tr. 573-80); physical therapists' observations of "poor" posture, with cervical and thoracic muscle tension, decreased range of motion in the cervical spine, and positive

Apley's Compression Test, Adson's Maneuver, and Soto Hall testing in March of 2008 (Tr. 575); Dr. Vrablik's observation of trigger point and medication side effects in March of 2008 (Tr. 635); Dr. Vrablik's observation of abnormal posture and elevated shoulder in August of 2008 (Tr. 631); and hospital records from August of 2008 showing weakness and discomfort in his neck extending to the right shoulder, along with "deformity of the right posterior shoulder and scapula with some muscle atrophy." (Tr. 601). Although Dr. Dwyer, Dr. Vrablik, Dr. Garrison, and the independent medical examiner had opined during the relevant that Plaintiff was unable to work, Dr. Potera indicated that there were no "treating or examining source statement[s] regarding the claimant's physical capacities in [the] file." (Tr. 360, 471-72, 491-95, 533, 535).

Consequently, Dr. Potera's opinion does not provide substantial evidence to reject Dr. Menio's opinion and Dr. Garrison's opinion. *See Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) ("Since the ALJ…misconstrued the evidence considered, his conclusion…must be reconsidered").

## 2. ALJ may not reject Dr. Menio's and Dr. Garrison's opinions with only lay reinterpretation of medical evidence

The ALJ writes that the Regulations do not "require" her to rebut a treating source medical opinion with another medical opinion. (Tr. 12).  However, the ALJ is also bound by Third Circuit precedent, which holds that an ALJ's lay reinterpretation of medical evidence does not provide substantial evidence to

assign less than controlling weight to a treating source medical opinion that is supported by at least some objective evidence. *See Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (Commissioner could not reject medical opinions "simply by having the administrative law judge make a different medical judgment"); *Doak v. Heckler*, 790 F.2d 26, 29-30 (3d Cir. 1986) ("[n]o physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence"); *Ferguson v. Schweiker*, 765 F.2d 31, 37, 36-37 (3d Cir. 1985); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983) ("the ALJ's conclusion that appellant is capable of engaging in sedentary activity is merely a function of the ALJ's own medical judgment. As such, his conclusion may not be permitted to stand, for we have pointed out time and again that these kinds of judgments are not within the ambit of the ALJ's expertise"); *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir.1983); *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 494 (3d Cir. 1980) ("[a]n administrative law judge may not reject professional medical evidence on the basis of his own observation"); *Rossi v. Califano*, 602 F.2d 55, 58-59, (3d Cir. 1979) (ALJ's opinion was "not supported by any medical opinion in this case… an ALJ is not free to set his own expertise against that of physicians who present competent medical evidence."); *Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir. 1979) ("[w]e have examined the record for an expert

medical opinion that Mrs. Rossi was capable of working…There is none"); *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978) ALJs must also give special deference to medical opinions from treating physicians and require good reasons to reject them in favor of evidence from non-treating sources ("treating source rule"). *Id.*; *see also* Fed. R. Evid. 702,[4] 1972 Advisory Committee Notes ("An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge…'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman[5] would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute'") (quoting Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952)).

In *Ferguson*, the Third Circuit held that merely citing to contradictory medical evidence, as opposed to contradictory medical opinion, is insufficient. *Ferguson*, 765 F.2d at 37. There, a physician opined that Plaintiff was disabled "based on laboratory reports contained in the record." *Id.* at 36. The ALJ found that

---

[4] Although the Federal Rules of Evidence do not apply to determinations under the Act, the rationale contained in the Advisory Committee notes is persuasive.

[5] The undersigned assumes, without deciding, that there may be cases where the medical evidence is so unambiguous that the untrained layman would be qualified to interpret the evidence, such as a case with no objective support whatsoever. *See Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014).

the claimant was not disabled because her records had "not resulted in end-organ

damage and is controlled adequately by medication," objective evidence indicated

only "non-specific EKG findings" and "'mild' arthritis," her onychomycosis

(fungal infections causing a foul odor in her hands) was not "vocationally

significant," and she had not treated certain problems with a specialist. *Id*. at 35.

The Court held that:

> [T[he ALJ acted improperly in discrediting the opinions of [the
> treating physician] by finding them contrary to the objective medical
> evidence contained in the file. By independently reviewing and
> interpreting the laboratory reports, the ALJ impermissibly substituted
> his own judgment for that of a physician; an ALJ is not free to set his
> own expertise against that of a physician who presents competent
> evidence. Again, if the ALJ believed that [the physician's] reports
> were conclusory or unclear, it was incumbent upon the ALJ to secure
> additional evidence from another physician.

*Id.* at 37. Absent an intervening change of law, these cases remain binding

precedent.

At the time of these decisions, the Regulations did not specify how to weigh

treating source medical opinions. *See* Standards for Consultative Examinations and

Existing Medical Evidence, 56 FR 36932-01 at 36933. Subsequently, Congress

instructed the Social Security Administration to promulgate regulations defining

when the ALJ should order a consultative examination. *Id.* ( "Congress, in passing

section 9 of Public Law 98-460, expressed satisfaction over [the Administration's]

success in better management of the consultative examination process, but stated

that [the Administration's] standards should appear in regulations"). Congress stated that it did not intend to alter how to weigh medical opinions. *Id.* at 36936.

In 1991, the Administration promulgated regulations regarding consultative examinations. *Id.*   The Administration also invoked its general rule making authority to promulgate regulations explaining how to weigh treating source medical opinions. *Id.*   The amended regulations defined medical opinion, codified the treating source rule, and identified factors for weighing medical opinions. *Id.* Pursuant to 20 C.F.R. §404.1527(c)(2), treating source medical opinions bind the ALJ when they are "well-supported" and not inconsistent with other substantial evidence. *Id.*

When an enactment "invade[s] the common law," the enactment is "read with a presumption" that the common law is retained. *United States v. Texas,* 507 U.S. 529, 534 (1993); *see also Noble Energy, Inc. v. Salazar*, 671 F.3d 1241, 1249 (D.C. Cir. 2012) (applying *Texas* to regulatory enactments); *ABN Amro Bank N.V. v. United States*, 34 Fed. Cl. 126, 131-32 (1995). To abrogate common law, the enactment "must 'speak directly' to the question addressed by the common law" or evince "a statutory purpose to the contrary." *Id.* (internal citations omitted).  If the text is "unambiguous," then the presumption is overcome. *Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (2013) (internal quotation omitted).  If the text is "compatible with preexisting practice," then the enactment is not sufficiently unambiguous to

overcome the presumption. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 543 (1994) (internal citations omitted). The party asserting that the enactment abrogates common law bears the burden of overcoming this presumption. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521 (1989) (internal citation omitted).

The text of 20 C.F.R. 404.1527(c)(2) is compatible with *Frankenfield*, *Doak*, *Ferguson*, *Kent*, *Van Horn, Kelly, Rossi, Fowler* and *Gober*. Section 404.1527(c)(2) indicates that an ALJ must produce inconsistent substantial evidence to assign less than controlling weight to a treating source medical opinion. The Regulations explicitly include non-medical evidence in the definition of inconsistent substantial evidence. *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936. The Regulations do not explicitly include lay reinterpretation of non-medical evidence in the definition of inconsistent substantial evidence. *See* 20 C.F.R. §404.1527. *Frankenfield*, *Doak*, *Ferguson*, *Kent, Van Horn, Kelly, Rossi, Fowler* and *Gober* define inconsistent substantial evidence, and exclude lay reinterpretation of medical evidence from the definition. *Supra*.

Section 404.1527(c) provides that treating source medical opinions must be well-supported, but the Social Security Administration ("Administration") "changed the term 'fully supported' to 'well-supported' because" the Administration:

> [A]greed with commenters who pointed out that 'fully supported' was unclear and that, more important, it was an impractically high standard which, even if it were attainable, would essentially make any opinion superfluous. We believe that the new term, 'well-supported,' is more practicable and more reasonable; it should make clear that we will adopt opinions that are well-supported by medically acceptable clinical and laboratory diagnostic techniques unless they are inconsistent with substantial evidence in the record.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936.  Moreover, the Regulations preclude an ALJ from concluding that a treating medical opinion is "unsupported" without recontacting the treating physician:

> Some commenters were concerned that the proposed language of §§ 404.1527(b) and (c), and 416.927(b) and (c) permitted us to discount a treating source's apparently unsupported opinion without recontacting the source, and that the rules placed highly restrictive conditions on obtaining additional information from treating sources.
>
> Response: To the contrary, recontact with treating sources to complete the case record and to resolve any inconsistencies in the evidence is one of the principal provisions of this set of rules. See §§ 404.1512(d) and 416.912(d) of these final regulations. Far from being restrictive, the intent of these rules is to require such contacts.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01, 36951-36952.

Section 404.1519a unambiguously requires the ALJ to obtain medical opinion evidence if there is an "inconsistency in the evidence" that needs to be resolved. *Id.* When the only medical opinions are from a treating source, entitled to special deference, and indicate that the claimant is disabled, there is an

inconsistency that needs to be resolved before the ALJ can find that the claimant is not disabled. *Id.* Section 404.1519a, read *in pari materia* with 20 C.F.R. §404.1527, suggests that the prohibition on lay reinterpretation of medical evidence to reject a treating source medical opinion was retained. Consequently, the text of the Regulations is not sufficiently unambiguous to overcome the presumption that the common law in *Frankenfield*, *Doak*, *Ferguson*, *Kent, Van Horn, Kelly, Rossi, Fowler* and *Gober* was retained.

No "statutory purpose to the contrary" is evident. *See Texas*, 507 U.S. at 534. Congress, the Social Security Administration, and the Supreme Court have all acknowledged that the intent of the amendments was to codify existing common law. *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36934 ("Although the circuit courts vary somewhat in their formulation of the rule on how treating source evidence is to be considered, the majority of the circuit courts generally agree on two basic principles. First, they agree that treating source evidence tends to have a special intrinsic value by virtue of the treating source's relationship with the claimant. Second, they agree that if the Secretary decides to reject such an opinion, he should provide the claimant with good reasons for doing so. We have been guided by these principles in our development of the final rule…"[i]n the preamble to the Notice of Proposed Rulemaking, we noted that the Senate Finance Committee had indicated in its

report on Public Law that it did not intend to alter in any way the relative weight that the Secretary places on reports received from treating physicians and from physicians who perform consultative examinations"); *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 823, 123 S. Ct. 1965, 1966, 155 L. Ed. 2d 1034 (2003) ("The 'treating physician rule' imposed by the Ninth Circuit was originally developed by Courts of Appeals as a means to control disability determinations by administrative law judges under the Social Security Act. In 1991, the Commissioner of Social Security adopted regulations approving and formalizing use of the rule in the Social Security disability program").

Retaining *Frankenfield*, *Doak*, *Ferguson*, *Kent, Van Horn, Kelly, Rossi, Fowler* and *Gober* also comports with the general purposes of the Act. First, the Act is "unusually protective" to claimants. *Heckler v. Day*, 467 U.S. 104, 106, 104 S. Ct. 2249, 2251, 81 L. Ed. 2d 88 (1984). Second, "[t]he disability programs administered under Titles II and XVI "are of a size and extent difficult to comprehend." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971)). "Accepting and codifying" clear-cut rules "serve[s] the need for efficient administration of an obligatory nationwide benefits program." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 823, 123 S. Ct. 1965, 1966, 155 L. Ed. 2d 1034 (2003). The "massive unexplained differences in the rate at which ALJs grant or deny benefits" heightens the need for the Courts to

articulate clear rules. Harold J. Krent & Scott Morris, *Inconsistency and Angst in District Court Resolution of Social Security Disability Appeals* at 5 (Chi.-Kent Coll. of Law, Research Paper No. 2014-30, 2014), *available at* http://papers.ssrn.com/sol3/papers.cfm? abstract_id=2530158.

In 2011, the Third Circuit held in *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011) that an ALJ could rely on an uncontradicted medical opinion from a state agency physician that the claimant was not disabled. *Id.* at 361-63. *Chandler* stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. *Id.* However, both these statements are dicta. In *Chandler*, the ALJ had medical opinion evidence and there was no contrary treating source opinion.[6] *Id.* "[D]ictum, unlike holding, does not have the strength of a decision 'forged from actual experience by the hammer and anvil of litigation.'" *Chowdury v. Reading Hosp. & Med. Ctr.,* 677 F.2d 317, 324 (3d Cir.1982) (internal quotations omitted). The only precedential holding in *Chandler* is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. *See Chandler*, 667 F.3d at 361-63.

---

[6] *Chandler*, 667 F.3d at 360 (Claimant's treating physician opinions could not "be considered by the District Court in making its substantial evidence review" because they were not timely filed before the ALJ).

*Chandler* does not accurately describe the Regulations cited for the dicta statements. For instance, *Chandler* states that that "the regulations do not require ALJs to seek outside expert assistance, *see* 20 C.F.R. §§ 404.1546(c), 404.1527(e)." *Chandler*, 667 F.3d at 362. However, 20 C.F.R. §404.1546(c) merely identifies which employee within the Social Security Administration assesses the RFC at each procedural stage, and provides that "the administrative law judge," as opposed to delegates of the Office of Disability Determinations, "is responsible for assessing [claimants'] residual functional capacity" at the administrative law judge stage. 20 C.F.R. §404.1546(b)-(c).

*Chandler*'s citation to 20 C.F.R. §404.1527(e) is a citation to the current 20 C.F.R. §404.1527(d). *See* How We Collect and Consider Evidence of Disability, 77 FR 10651-01 ("Redesignat[ing] paragraphs (d) through (f) as (c) through (e)"). These provisions address statements on issues reserved to the Commissioner. *Id.* Statements on issues reserved to the Commissioner are excluded from the definition of "medical opinion." 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions"); 20 C.F.R. § 404.1527(d) ("Medical source opinions on issues reserved to the Commissioner…are not

medical opinions, as described in paragraph (a)(2) of this section"). Thus, 20 C.F.R. §404.1527(d) does not apply to medical opinions. Neither Regulation cited by *Chandler* "clearly" speaks to the use of medical opinions. *United States v. Texas,* 507 U.S. 529, 534 (1993).

*Chandler* states that "RFC findings of non-examining State agency consultants are 'based on the evidence ... but are not in themselves evidence.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting 20 C.F.R. §404.1527(f)(1), "[r]edesignated as subsection (e) by 77 FR 10656." 20 C.F.R. § 404.1527(f)). However, this provision only applies to the initial determination phase. 20 C.F.R. § 404.1527(e)(1)(i). Consequently, this provision does not apply to determinations by an ALJ. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("[A]dministrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence").[7]

---

[7] *Chandler* also states that "the ALJ was not required to consider [a nurse practitioner's opinion at all because, as a nurse practitioner, she is not an 'acceptable medical source[ ].' *See* 20 C.F.R. § 404.1513(a)." *Chandler*, 667 F.3d at 361-62. However, 20 C.F.R. § 404.1513(a) merely provides that diagnoses must come from an acceptable medical source for an impairment to be considered medically determinable at step two. *Id.* Section 404.1513(a) does not address whether an ALJ should consider opinion evidence from other medical sources. In contrast, 20 C.F.R. 404.1513(d) provides that an ALJ "may also use evidence" from "[m]edical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)." Pursuant to SSR 06-3p, "[i]nformation from these 'other sources'

*Chandler* cited other Regulations that purportedly provide that "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler*, 667 F.3d at 361 (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir.2011)) (citing 20 C.F.R. §404.1527(d)(1)-(2) (redesignated as 20 C.F.R. §404.1527(c)(1)-(2) by 77 FR 10651-01)). However, as discussed above, §404.1527(c) provides that some medical opinions from treating providers do bind the ALJ. *Supra*. In contrast, the Regulations explicitly provide that medical opinions from non-treating physicians and statements from treating providers that are not medical opinions because they are on issues reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); 20 C.F.R. § 404.1527(e)(2)(i) ("Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists"). These provisions do not apply to

cannot establish the existence of a medically determinable impairment" but "information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* SSR 06-3p provides that opinions from other medical sources should be weighed using the same factors for opinions from acceptable medical sources. *Id.* Consequently, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* Thus, "the adjudicator generally should explain the weight given to opinions from these "other sources…" *Id.*

treating source medical opinions. *Id.* Consequently, they would be superfluous if no treating source medical opinion binds the ALJ. *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010) (Court should not interpret provision to "render another provision superfluous") (internal citations omitted).

Since *Frankenfield*, the Third Circuit has affirmed an ALJ who declined to assign controlling weight to a treating source medical opinion in *Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991); *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999); and *Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011). In each case, the ALJ relied on at least two medical opinions that the claimant was not disabled. *See Jones*, 954 F.2d at 129; *Plummer*, 186 F.3d at 430; *Brown,* 649 F.3d at 194. Consequently, lay reinterpretation of medical evidence was not required. *Id.* Additionally, in *Plummer*, the treating source rule was not implicated, because the ALJ relied on "several other treating physician[s']" medical opinions that the claimant was not disabled over another treating source medical opinion that the claimant was disabled. *See Plummer*, 186 F.3d at 430. None of these cases allow lay reinterpretation of medical evidence. *See Jones*, 954 F.2d at 129; *Plummer*, 186 F.3d at 430; *Brown,* 649 F.3d at 194.

The Third Circuit has continued to uphold the prohibition on lay reinterpretation of medical evidence, even when a state agency medical opinion indicates that the claimant is not disabled. *See Morales v. Apfel*, 225 F.3d 310, 317

(3d Cir. 2000); *Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008); *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009); *cf. Dority v. Comm'r Soc. Sec.*, No. 14-3500, 2015 WL 4624166, at *2 (3d Cir. Aug. 4, 2015) (Recognizing rule that ALJ may not improperly substitute lay opinion for the opinion of experts, but noting that this rule was not implicated, because ALJ "relied heavily" on expert testimony). In *Morales*, the ALJ rejected a medical opinion that the claimant was disabled based on "personal observations of [the claimant] at the administrative hearing…evidence in the record of malingering, and notations in… treatment notes that [the claimant] was stable and well controlled with medication." *Morales*, 225 F.3d at 317. A non-treating, non-examining physician opined that the claimant was not disabled. *Id*. at 317. However, the Third Circuit reversed the ALJ's decision, explaining that the ALJ could not "disregard [the treating] medical opinion based solely on his own amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility." *Id.* at 318 (internal citations omitted). The Third Circuit explained that the ALJ relied on "pieces of the examination reports that supported this determination," but "[t]he Commissioner cannot reject [the treating source's] medical opinion simply by having the ALJ make a different medical judgment." *Id.*

Since 2011, Courts in this District have declined to rely on dicta in *Chandler*, *Jones*, *Brown*, or *Plummer* and granted claimants' appeals in dozens of

cases when an ALJ rejects a treating source medical opinion with only lay reinterpretation of medical evidence.[8] In cases before the undersigned alone, the Court has granted claimants' appeal in at least thirty-three cases in just the last

---

[8]*See e.g Ralph v. Colvin,* No. 1:14-CV-01230, 2015 WL 2213576, at \*16 (M.D. Pa. May 11, 2015); *Weinus v. Colvin,* No. 1:14-CV-00438, 2015 WL 461850, at \*9 (M.D. Pa. Feb. 4, 2015); *Miller v. Colvin,* No. 3:13-CV-02348, 2014 WL 4457232, at \*9 (M.D. Pa. Sept. 10, 2014); *Bloomer v. Colvin,* 3:13–CV–00862, 2014 WL 4105272, at \*5 (M.D.Pa. Aug.19, 2014) (Jones, J.); *House v. Colvin,* 3:12–CV–02358, 2014 WL 3866072, at \*8 (M.D.Pa. Aug.6, 2014) (Kane, J.); *Muhaw v. Colvin,* CIV.A. 3:12–2214, 2014 WL 3743345, at \*15 (M.D.Pa. July 30, 2014) (Mannion, J.); *Zerbe v. Colvin,* No. 3:12-CV-01831, 2014 WL 2892389, at \*9 (M.D. Pa. June 26, 2014); *Maellaro v. Colvin,* 3:12–CV–01560, 2014 WL 2770717, at \*11 (M.D.Pa. June 18, 2014) (Mariani, J.); *Russell-Harvey v. Colvin,* No. 3:12-CV-00953, 2014 WL 2459681, at \*13 (M.D. Pa. May 29, 2014); *Vergnetti v. Colvin,* No. 3:13-CV-02332, 2014 WL 1515850, at \*7 (M.D. Pa. Apr. 18, 2014); *Arnold v. Colvin,* 3:12–CV–02417, 2014 WL 940205, at \*4 (M.D.Pa. Mar.11, 2014) (Brann, J.); *Keller v. Colvin,* No. 3:12-CV-01502, 2014 WL 658064, at \*13 (M.D. Pa. Feb. 20, 2014); *Gormont v. Astrue,* 3:11–CV–02145, 2013 WL 791455, at \*7 (M.D.Pa. Mar.4, 2013) (Nealon, J.); *Ames v. Astrue,* No. 3:11-CV-1775, 2013 WL 435451, at \*19 (M.D. Pa. Feb. 4, 2013); *Ennis v. Astrue,* No. 4:11-CV-01788, 2013 WL 74375, at \*8 (M.D. Pa. Jan. 4, 2013); *Kaumans v. Astrue,* 3:11–CV–01404, 2012 WL 5864436, at \*12 (M.D.Pa. Nov.19, 2012) (Caputo, J.); *Troshak v. Astrue,* 4:11–CV–00872, 2012 WL 4472024, at \*7–8 (M.D.Pa. Sept.26, 2012) (Munley, J.); *Shannon v. Astrue,* No. 4:11-CV-00289, 2012 WL 1205816, at \*14 (M.D. Pa. Apr. 11, 2012); *Shedden v. Astrue,* 4:10–CV–2515, 2012 WL 760632, at \*11 (M.D.Pa. Mar.7, 2012) (Rambo, J.); *Gunder v. Astrue,* Civil No. 11–300, slip op. at 44–46(M.D.Pa. February 15, 2012) (Conaboy, J.); *Dutton v. Astrue,* Civil No. 10–2594, slip op. at 37–39(M.D.Pa. January 31, 2012) (Munley, J.) (Doc. 14); *Yanchick v. Astrue,* Civil No. 10–1654, slip op. at 17–19 (M.D. Pa. April 27, 2011) (Muir, J.) (Doc. 11); *Coyne v. Astrue,* Civil No. 10–1203, slip op. at 8–9 (M.D. Pa. June 7, 2011) (Muir, J.) (Doc. 21); *Crayton v. Astrue,* Civil No. 10–1265, slip op. at 38–39 (M.D.Pa. September 27, 2011) (Caputo, J.) (Doc, 17).

eighteen months when an ALJ rejects a treating source medical opinion with only

lay reinterpretation of medical evidence.[9]

_____

[9] *See Brown v. Colvin*, No. CV 3:14-0100, 2015 WL 7428579, at *3 (M.D. Pa. Nov. 23, 2015); *Costanzi v. Colvin*, No. 1:14-CV-752, 2015 WL 6786726, at *1 (M.D. Pa. Nov. 6, 2015); *Cobourn v. Colvin*, No. 1:14-CV-01292-GBC, 2015 WL 5785733, at *1 (M.D. Pa. Sept. 30, 2015; *Voorhees v. Colvin*, No. 3:13-CV-02583-GBC, 2015 WL 5785830, at *25 (M.D. Pa. Sept. 30, 2015; *Davenport v. Colvin,* No. 3:14-cv-1295 (M.D. Pa. Sept. 25, 2015); *Thanh Tam Vo v. Colvin*, No. 1:14-CV-00541-GBC, 2015 WL 5514981, at *4 (M.D. Pa. Sept. 15, 2015); *Ciccia v. Colvin*, No. 1:14-CV-1552, 2015 WL 5093357, at *1 (M.D. Pa. Aug. 28, 2015); *Wilson v. Colvin*, No. 3:13-cv-2145 (M.D. Pa. Aug. 2015); *Paisley v. Colvin*, No. 1:14-CV-1656, 2015 WL 5012463, at *1 (M.D. Pa. Aug. 20, 2015); *Moncak v. Colvin*, No. 1:14-CV-1378-GBC, 2015 WL 4647610, at *1 (M.D. Pa. Aug. 5, 2015); *Ames v. Colvin*, No. 3:13-cv-2480-RDM (M.D. Pa. July 14, 2015); *Kipp v. Colvin*, No. 1:13-cv-2552-MWB (M.D. Pa. May 13, 2015); *Kester v. Colvin*, No. 3:13-CV-02331, 2015 WL 1932157, at *2 (M.D. Pa. Apr. 21, 2015); *Jimenez v. Colvin*, No. 3:13-CV-2861 (M.D. Pa. April 14, 2015); *Miller v. Colvin*, No. 3:13-CV-02594-GBC, 2015 WL 1609671, at *6 (M.D. Pa. Apr. 10, 2015); *Dennis v. Colvin*, No. 3:13-CV-2537, 2015 WL 1608714, at *1 (M.D. Pa. Apr. 10, 2015); *Speese v. Colvin*, No. 1:13-2805-JEJ at *1 (M.D. Pa. April 10, 2015); *Richardson v. Colvin*, No. 1:13-CV-02944-GBC, 2015 WL 1608665, at *7 (M.D. Pa. Apr. 10, 2015; *Protzman v. Colvin*, No. 3:13-CV-2558, 2015 WL 1605765, at *2 (M.D. Pa. Apr. 9, 2015); *Williams v. Colvin*, No. 1:14-CV-00557-GBC, 2015 WL 1499804, at *6 (M.D. Pa. Mar. 31, 2015); *Eckrote v. Colvin*, No. 3:13-CV-02403-GBC, 2015 WL 1471507, at *8 (M.D. Pa. Mar. 31, 2015); *Cliff v. Colvin*, No. 1:13-CV-02985-GBC, 2015 WL 1499769, at *4 (M.D. Pa. Mar. 31, 2015); *Lynch v. Colvin*, No. 3:13-cv-2654 (M.D. Pa. March 26, 2015); *McKean v. Colvin*, No. 1:13-CV-2585, 2015 WL 1201388, at *8 (M.D. Pa. Mar. 16, 2015); *Duvall-Duncan v. Colvin*, No. 1:14-CV-17, 2015 WL 1201397, at *11 (M.D. Pa. Mar. 16, 2015; *Hawk v. Colvin*, No. 1:14-CV-337, 2015 WL 1198087, at *2 (M.D. Pa. Mar. 16, 2015); *Thompson v. Colvin*, No. 3:13-CV-02605, 2015 WL 915484, at *15 (M.D. Pa. Mar. 3, 2015); *Sherman v. Colvin,* No. 3:14-cv-00386-RDM (M.D. Pa. Feb. 23, 2015; *Gonzales v. Colvin*, No. 3:13–cv–02620, (M.D.Pa. Feb. 17, 2015); *Wilson v. Colvin*, No. 3:13-CV-709, 2015 WL 140036, at *1 (M.D. Pa. Jan. 12, 2015); *Mazella v. Colvin*, No. 3:12-cv-1777-RDM (M.D. Pa. Dec. 8, 2014); *Hendrickson v. Colvin*, 2014 U.S. Dist. LEXIS 171610, 25-26 (M.D. Pa. Nov. 21, 2014); *Kovach v. Colvin*, No. 1:13-CV-01626-GBC, 2014 WL 4796367, at *15 (M.D. Pa. Sept. 26, 2014); *Gray v.*

Courts in the District have affirmed an ALJ's denial in the "extremely rare" case when non-medical evidence directly contradicted a treating source medical opinion. *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936; *Torres v. Barnhart*, 139 F. App'x 411, 414 (3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014); *Marr v. Colvin*, No. 1:13-cv-2499 (M.D.P.A. April 15, 2015). However, the "non-medical" evidence must be truly "inconsistent" with the opinion. Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936; *see also Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) ("the ALJ's decision fails to explain how Chunn's activities and behaviors are inconsistent with Dr. Ziolkow's characterization of her mental capacity.").

Congress subsequently amended the Act. Under the amended Act, effective within one year of November 2, 2015, there must be medical expert review of the medical evidence for any claimant who establishes any medically determinable impairment. *See* BIPARTISAN BUDGET ACT OF 2015, PL 114-74, November 2, 2015, 129 Stat 584, §832(a) ("in any case where there is evidence which

---

*Colvin*, No. 3:13-CV-01944-GBC, 2014 WL 4536552, at *1 (M.D. Pa. Sept. 11, 2014); *Campanaro v. Colvin*, No. 3:12-CV-1527, 2014 WL 4272728, at *24 (M.D. Pa. Aug. 28, 2014).

indicates the existence of a mental impairment, that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment; and (2) in any case where there is evidence which indicates the existence of a physical impairment, that a qualified physician has completed the medical portion of the case review and any applicable residual functional capacity assessment."). This change is particularly notable given the context of the other amendments to the Act, which were generally designed to save costs for the Administration.[10] This amendment recognizes that medical evidence requires review by an individual with medical training, rather than lay interpretation. *See also North Haven Board of Education v. Bell,* 456 U.S. 512, 535 (1982) ("Although postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions") (quoting *Cannon v. Univ. of Chi.,* 441 U.S. 677, 686 n. 7, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)); *Goncalves v. Reno,* 144 F.3d 110, 133 (1st Cir.1998) ("[S]ubsequent legislative developments, although never determinative in themselves, can be 'significant' clues to congressional intent.")

---

[10] Subtitle A, entitled "Ensuring Correct Payments and Reducing Fraud," expands fraud investigation units nationwide, prohibits the Commissioner from considering evidence from medical providers who have been convicted of certain crimes, creates "new and stronger penalties" for Social Security fraud, and requires electronic payroll data to improve efficient administration. *Id.* §§811-831.

(quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

Consequently, with regard to lay reinterpretation of medical evidence, *Frankenfield*, *Doak*, *Ferguson*, *Kent, Van Horn, Kelly, Rossi, Fowler* and *Gober* continue to bind District Courts in the Third Circuit. No reasonable person would find an ALJ's lay reinterpretation of medical evidence to be adequate to reject a supported treating source medical opinion.

### 3.    Commissioner's litigating position is not entitled to deference

An agency's "fair and considered" interpretation of a regulation is entitled to deference. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-21667 (2012) (internal citations omitted). However, deference to an agency's interpretation is inappropriate when the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question," such as "when it appears that the interpretation is nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Id*.

The Social Security Administration has multiple mechanisms to communicate fair and considered judgment on a matter, including Social Security Rulings, Acquiescence Rulings, and regulations. *See* 20 C.F.R. § 402.35(b)(1) ("Social Security Rulings…are binding on all components of the Social Security

Administration."); *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287 (3d Cir. 2012) (citing 20 C.F.R. § 404.985(b) (SSA will issue an Acquiescence Ruling when it "determine[s] that a United States Court of Appeals holding conflicts with [the SSA"]s] interpretation of a provision of the Social Security Act or regulations")). The Social Security Administration has issued no Social Security Ruling, Acquiescence Ruling, or regulation authorizing an ALJ to reject a treating source medical opinion with only lay reinterpretation of medical evidence.

Other Circuits have concluded that an ALJ is still prohibited from rejecting medical expert opinions with lay interpretation of medical evidence. *See Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998); *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009); *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004); *Harbor v. Apfel*, 242 F.3d 375 (8th Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Wilder v. Chater*, 64 F.3d 335, 337-38 (7th Cir. 1995). The SSA has not issued any acquiescence rulings indicating that any of the above-described decisions from the Court of Appeals "conflicts with [its] interpretation of a provision of the Social Security Act or regulations." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 301 (3d Cir. 2012). Consequently, the undersigned concludes that any argument by Defendant that the ALJ may reject a treating source opinion using only lay interpretation of medical

evidence "does not reflect the agency's fair and considered judgment on the matter in question" and "appears [to be] nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Christopher*, 132 S. Ct. at 2166-67 (internal citations omitted).

### 4.   Application

The ALJ lacked substantial evidence to find that Dr. Garrison's opinion was not well-supported. The Administration "changed the term 'fully supported' to 'well-supported' because" the Administration:

> [A]greed with commenters who pointed out that 'fully supported' was unclear and that, more important, it was an impractically high standard which, even if it were attainable, would essentially make any opinion superfluous. We believe that the new term, 'well-supported,' is more practicable and more reasonable; it should make clear that we will adopt opinions that are well-supported by medically acceptable clinical and laboratory diagnostic techniques unless they are inconsistent with substantial evidence in the record.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936.

Dr. Menio's opinion supported Dr. Garrison's opinion.   Dr. Garrison's treatment record indicates multiple objective findings. Dr. Garrison also reviewed and explicitly acknowledged medical records from Plaintiff's specialists. (Tr. 533, 539). Prior to the relevant period, in December of 2007, his physical therapists, primary care provider Dr. Garrison, and physiatrist Dr. Vrablik observed continued

upper extremity and abdominal weakness. (Tr. 471-72, 555, 952-79). In 2008, physical therapists observed abnormal posture, range of motion, muscle tension, muscle spasm, spinal dysfunction, and positive Apley's Compression Test, Adson's Maneuver, and Soto Hall testing. (Tr. 572-80, 982-88, 991).  Dr. Vrablik observed pain limited strength, decreased range of motion, abnormal posture, an elevated right shoulder, and swelling in the legs. (Tr. 630-32). Dr. Garrison observed depression and noted the physical therapists report of "very limited/frozen" cervical spine range of motion. (Tr. 539). Evaluation for abdominal surgery in August of 2008 indicated weakness and discomfort in his neck extending to the right shoulder, along with "deformity of the right posterior shoulder and scapula with some muscle atrophy." (Tr. 601).

During the relevant period, Dr. Garrison observed muscle spasm in the neck (Tr. 652, 818, 822, 852), muscle spasm in the back (Tr. 806), abnormal range of motion in the neck and spine (Tr. 652, 806, 818, 822), muscle spasm in the thoracic spine (Tr. 653), abdominal distention (Tr. 852), abdominal rigidity (Tr. 852), and abdominal tenderness. (Tr. 653, 818, 852). For instance, on July 13, 2010, Plaintiff "appear[ed] ill." (Tr. 652). He had abnormal neck motion, stiffness, muscle spasm, and pain. (Tr. 652). He exhibited tenderness and muscle spasm in his thoracic spine. (Tr. 653). He had abdominal tenderness. (Tr. 653).

Dr. Vrablik observed Plaintiff's legs were swelling, he was slow to transition from sit to stand, his posture was "very poor," and he exhibited decreased cervical range of motion, strength, and sensation. (Tr. 623, 628, 665-66, 668). MRI of the cervical spine showed "mild degenerative disc disease" and a CT scan showed "mild fragmentation at the tip of the odontoid." (Tr. 615-16, 1008). Physical therapists observed his posture and appearance were "poor," muscle tension in his cervical and thoracic spine with limited range of motion in his cervical spine, and positive Adson's maneuver and Soto Hall testing. (Tr. 679). Dr. Boorse observed "an upper midline diastasis rectus" and two hernias, one "at the level of his umbilicus" and a "small, slightly tender right inguinal hernia which is easily reducible." (Tr. 647).

Shortly after the relevant period, in March of 2012, Plaintiff exhibited muscle spasm, tenderness, and positive straight leg raise. (Tr. 882). Lumbar spine MRI indicated "right-sided disc herniation at L5-S1 which may be accounting for some of the symptoms" with "additional mild degenerative changes." (Tr. 871).

Consequently, Dr. Garrison's opinion was supported by many objective findings. Because Dr. Garrison's opinion was well-supported, the ALJ had to identify substantial evidence that was inconsistent with Dr. Garrison's opinion. Again, Dr. Menio's opinion corroborated Dr. Garrison's opinion. Aside from Dr. Potera, no medical opinion is inconsistent with Dr. Garrison's opinion. The non-

medical evidence cited by the ALJ, such as his activities of daily living, is not inconsistent with Dr. Garrison's opinion. (Tr. 29).

The ALJ wrote that Dr. Potera's opinion was "well supported and consistent with [the] record" because "there is no evidence of significant lumbar pathology and examinations during the relevant period are essentially normal and benign, noting no significant longitudinal objective deficits" and "there are no objective deficits that correlate or are attributable to his subjective complaints." (Tr. 22). The ALJ wrote that "[t]he examination findings within Dr. Garrison's notes during the relevant period are normal" and Dr. Garrison opined that his condition was "stable." (Tr. 26). The ALJ also concluded that Dr. Garrison's opinion did not "set forth any explanation in terms of signs or laboratory findings to support the opinions. As such, little weight can be afforded these opinions as they are clearly not well supported on the face of the opinions, the doctor's own records or the record as whole." (Tr. 26). The ALJ wrote that Dr. Menio's opinion was entitled to little weight because "[d]espite repeated requests for the doctor to support this opinion by pointing to objective evidence of signs' and laboratory findings, the doctor admitted the evidence failed to support any significant objective deficits, however, that he ;was relying on the claimant's subjective reporting of pain, a subjective complaint and not upon any signs or laboratory findings." (Tr. 28).

First, as discussed above, this is a mischaracterization of the record. Plaintiff had many documented objective abnormalities. *See Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) ("Since the ALJ…misconstrued the evidence considered, his conclusion…must be reconsidered"). Dr. Menio also identified objective abnormalities. Dr. Menio explained that "[a]n individual with back spasms and tenderness would not be able to be able to do a full range of activity." (Tr. 137-38). Dr. Menio identified "objective findings…on physical examination by Dr. Garrison," such as "muscle spasms along with associated complaints of back pain and muscle stiffness which is supported by the physical examination"  and "evidence of a restricted -- a range of motion." (Tr. 138). Dr. Menio  also identified "trigger points" and "right shoulder weakness." (Tr. 134). Dr. Menio noted Plaintiff's diagnosis of spondylosis and his "multiple medications." (Tr. 137). Dr. Menio explained that "in dealing with individuals who have neck surgeries, the greatest proportion of people…[do] not become successful." (Tr. 133-34). He noted that there may be "a significant amount of symptomatology related to… scar tissue" which does not appear on imaging. (Tr. 134). Dr. Menio explained that a "musculoskeletal type of pathology" is not typically "seen on any type of imaging study." (Tr. 139). Second, this constitutes impermissible lay reinterpretation of medical evidence. *See Frankenfield,* 861 at 408; *Doak*, 790 F.2d at 29-30; *Ferguson*, 765 F.2d  at 36-37; *Kent*, 710 F.2d at 115; *Van Horn*, 717 F.2d at 874;

*Kelly*, 625 F.2d at 494; *Rossi* 602 F.2d at 58-59; *Fowler v. Califano*, 596 F.2d at 603; *Gober v. Matthews*, 574 F.2d at 777. No reasonable person would find the ALJ's lay reinterpretation of medical evidence to be adequate to reject Dr. Garrison's opinion. *Id.*

The ALJ also failed to consider Dr. Garrison's opinions from 2008 and 2009, indicating that "none of these opinions were issued prior to August of 2010." (Tr. 22). Moreover, the Court notes that Plaintiff reported that Dr. Kurtzer opined that he suffered disabling limitations, but no opinion on Plaintiff's functioning from Dr. Kurtzer appears in the record. (Tr. 765). Dr. Vrablik indicated that he submitted an opinion identifying "limitations especially in lifting, carrying, pushing and pulling…Able to do minimal work at the house." (Tr. 789-90, 794-95). No evaluation from Dr. Vrablik appears in the record. Doc. 8.

The ALJ lacked substantial evidence to reject Dr. Garrison's opinion. *Id.* This error was not harmless, because Dr. Garrison's opinion indicates limitations that would entitle Plaintiff to benefits prior to December 27, 2011. *Supra.* Consequently, the Court recommends the case be remanded to the Commissioner to properly evaluate the medical opinions.

## B.     Other Allegations of Error

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations of error. A remand may produce different

results, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

### C.    Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. Plaintiff urges the Court to reverse and award benefits, rather than remand the case. Here, the ALJ has already refused once to comply with a remand order to properly assess the medical opinions. (Tr. 184-88). The undersigned notes that this particular ALJ, Therese Hardiman, has been the subject of several remand orders in cases before the undersigned for failing to properly evaluate medical opinion evidence. *See Eckrote v. Colvin*, No. 3:13-CV-02403-GBC, 2015 WL 1471507, at *8 (M.D. Pa. Mar. 31, 2015) ("ALJ [Hardiman] was not entitled to independently interpret Plaintiff's MRI to reject Dr. Sedor's opinion."); *Sherman v. Colvin*, No. 3:14-CV-00386-RDM (M.D. Pa. Feb. 25, 2015); *Ames v. Colvin*, No. 3:13-CV-02480-RDM (M.D. Pa. August 11, 2015).

However, the ALJ alternatively found that Plaintiff could perform sedentary skilled work past relevant work through August 2, 2010. (Tr. 23). As discussed above, the vocational evidence relied on by the ALJ to conclude that Plaintiff could perform past work was based on an erroneous RFC. (Tr. 22). Consequently, the Court recommends remand for the ALJ to obtain accurate vocational evidence. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course,

except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)). The Court further recommends that the ALJ be instructed that neither Dr. Potera's opinion nor her own lay reinterpretation of medical evidence suffice to reject Dr. Garrison or Dr. Menio's opinion.

## VII.   Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence. Specifically, the Court recommends the Commissioner be required to identify substantial non-medical or medical opinion evidence to refute Dr. Garrison's opinion, because the ALJ's lay interpretation of medical evidence is insufficient to reject Dr. Garrison's opinion.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in

28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 14, 2016                          s/Gerald B. Cohn
                                          GERALD B. COHN
                                 UNITED STATES MAGISTRATE JUDGE